UNITED STATES DISTRICT COURT
DISTRICT OF MAINE

| | |
|---|---|
| ANIMAL PROTECTION INSTITUTE,   )<br>                                                        )<br>            Plaintiff                          )<br>    v.                                              )          CV-06-128-B-W<br>                                                        )<br>ROLAND D. MARTIN,                 )<br>Commissioner of the Maine Department of  )<br>Inland Fisheries and Wildlife,           )<br>                                                        )<br>            Defendant.                    ) | |

## ORDER ON MOTION TO INTERVENE

On January 4, 2007, the U.S. Sportsmen's Alliance Foundation, Sportsman's Alliance of Maine, Maine Trappers Association, Fur Takers of America, Oscar Cronk, Donald Dudley, and Alvin Theriault (Intervenors) moved to intervene in the pending litigation pursuant to Fed. R. Civ. P. 24. *See Mot. to Intervene* (Docket # 15). Animal Protection Institute (API) filed a limited objection to their intervention; that is, they propose that the trappers be allowed to intervene for the remedial aspect of the litigation only. *See Pl.'s Opp'n to Mot. to Intervene* (Docket # 32) (*Pl.'s Opp'n*). The Court grants the motion to intervene without limitation.

## I. STATEMENT OF FACTS

### A.    The Complaint

On October 12, 2006, API filed suit against Roland Martin, in his capacity as Commissioner of the Maine Department of Inland Fisheries and Wildlife (DIFW), for declaratory and injunctive relief, alleging that DIFW has violated the Endangered Species Act (ESA) "by authorizing and allowing trapping activities that 'take' Bald Eagles, Canada Lynx and

Gray Wolves – species listed as protected from take under the ESA." *Compl.* ¶ 1.[1]  According to API, the ESA's take provisions "ensure that state agencies and citizens do not trap, attempt to trap, or cause or allow the trapping of Federally-listed threatened and/or endangered species . . . ." *Id.* ¶ 3.[2]

The Complaint alleges that DIFW "allows each licensed trapper to set an unlimited number of traps in places where Bald Eagles, Canada Lynx and Gray Wolves range," and "allows trappers to leave their traps unchecked and unattended for up to five (5) days, depending on the trap and where it is set." *Compl.* ¶ 15.  API further claims that the U.S. Fish & Wildlife Service (FWS) has recommended to DIFW certain "procedures to reduce the unintentional take of threatened or endangered species," which DIFW has failed to adopt. *Id.* ¶ 17.  The crux of the matter is whether DIFW's policies violate Section 9 of the ESA.[3]

**B.    The Prospective Intervenors**

The prospective Intervenors consist of organizations and individuals opposed to any change in Maine's trapping policies.  The Maine Trappers Association is an association of 990 regular trappers – most of whom are Maine residents – who engage in trapping for their livelihoods or for recreation. *Mot. to Intervene* at 4-5.  The association participates in trapping regulation matters before DIFW.  *Id.* at 5.  The Sportsman's Alliance of Maine is the largest sportsmen's organization in the state and has as its purpose "to provide the service, assistance and funding required to protect and insure retention of the Maine heritage of hunting, trapping,

---

[1] According to the Complaint, the Bald Eagle and Canada Lynx are both "threatened" species, *see Compl.* ¶¶ 19, 21, while the Gray Wolf is an "endangered" species, *Compl.* ¶ 25.

[2] "Except as provided in sections 6(g)(2) and 10 of this Act [16 U.S.C. §§ 1535(g)(2), 1539], with respect to any endangered species of fish or wildlife listed pursuant to section 4 of this Act [16 U.S.C. § 1533] it is unlawful for any person subject to the jurisdiction of the United States to take any such species within the United States or the territorial sea of the United States."  16 U.S.C. § 1538(a)(1)(B); *see also* 50 C.F.R. § 17.31.

[3] API seeks a declaratory judgment that DIFW "is violating Section 9 of the ESA by authorizing, administering and allowing trapping practices that 'take' Bald Eagles, Canada Lynx and Gray Wolves" and an injunction that would keep DIFW from "continuing to violate the ESA." *Compl.* at 13-14.

and fishing." *Id*. The Sportsmen's Alliance of Maine has 1,160 members who are Maine trappers. *Id.* The U.S. Sportsmen's Alliance Foundation is a nationwide organization devoted, among other things, to the preservation of legal trapping activities. *Id*. at 6. Based in Indiana, Fur Takers of America is organized to protect "the rights of citizens to trap fur-bearing animals in a lawful manner." *Id*. at 7. Fur Takers of America counts among its membership approximately thirty Maine residents. *Id*. Oscar Cronk is a native Mainer who has trapped in the state for more than sixty years as a source of income; he not only sells "the furs of animals he traps," but also traps "predator animals on behalf of property owners." *Id*. at 7-8. Donald Dudley has trapped various animals – including coyote, beaver, martin, fisher, fox and otter – in Maine for about fifty years; he, too, earns a significant portion of income from trapping and serving as a guide for other trappers. *Id*. at 8. Alvin Theriault holds a trapping license in Maine and traps to protect his chicken farm from predatory animals. *Id*. at 8-9.

## II.    DISCUSSION

### A.  Intervention of Right

The Intervenors claim they are entitled to intervene of right, pursuant to Fed. R. Civ. P. 24(a).[4] The First Circuit has broken down the moving party's burden under Rule 24(a) into four requirements:

> A putative intervenor thus must show that (1) it timely moved to intervene; (2) it has an interest relating to the property or transaction that forms the basis of the ongoing suit; (3) the disposition of the action threatens to create a practical impediment to its ability to protect[] its interest; and (4) no existing party adequately represents its interests.

---

[4] The pertinent section of the rule allows for intervention "when the applicant claims an interest relating to the property or transaction which is the subject of the action and the applicant is so situated that the disposition of the action may as a practical matter impair or impede the applicant's ability to protect that interest, unless the applicant's interest is adequately represented by the existing parties." Fed. R. Civ. P. 24(a).

3

*B. Fernandez & Hnos., Inc. v. Kellogg USA, Inc.*, 440 F.3d 541, 544-45 (1st Cir. 2006); *see also Travelers Indem. Co. v. Dingwell*, 884 F.2d 629, 637 (1st Cir. 1989).  Each element must be met to allow intervention.  *Kellogg*, 440 F.3d at 545.  "While Rule 24(b) should be construed liberally, the court must consider the potential adverse impact on the original parties."  *United States v. Massachusetts*, Civ. No. 85-0632-MA, 1986 U.S. Dist. LEXIS 26224, at *27 (D. Mass. April 28, 1986).

The First Circuit dealt with a similar case in *Conservation Law Found., Inc. v. Mosbacher* in which seven commercial fishing groups sought to intervene in a law suit that two environmental groups brought against the Secretary of Commerce, "alleging that the Secretary had inappropriately approved a fishery plan submitted under the provisions of the Magnuson Act . . . ."  966 F.2d 39, 40 (1st Cir. 1992).  The plaintiffs requested that the Secretary implement a new plan to prohibit overfishing in coastal New England waters.  *Id.*  Before the court ruled on the motions to intervene, the parties agreed to a consent decree, which "set a timetable for development of a plan that would eliminate the over-fished condition" of certain species.  *Id.* at 41.  The district court simultaneously denied the motion to intervene and approved the consent decree.

On appeal, the First Circuit vacated that order.  *Conservation Law Foundation* noted that "if the Foundation prevails, by its own admission, the fishing groups' economic interests will be substantially affected." *Id.* at 43.  Because "[t]he fishing groups seeking intervention are the real targets of the suit and are the subjects of the regulatory plan," they had a right to intervene in the litigation.  *Id*.  *Conservation Law Foundation* concluded that the fishing groups had "demonstrated both an interest in, and an adverse effect from, the consent decree negotiations by the Foundation" and that the Secretary of Commerce could not adequately represent their

interests, because his judgments were "necessarily constrained by his view of the public welfare." *Id*. at 44.

*Maine v. United States Fish & Wildlife Service,* 262 F.3d 13 (1st Cir. 2001), provides a counterpoint. In *Maine*, the First Circuit upheld the district court's discretionary decision to deny intervention.[5] *Maine* involved a challenge by the state of Maine and several business groups to a United States Fish and Wildlife Service (FWS) decision "designating Atlantic Salmon in an area comprised of seven Maine rivers to be an endangered species under the Endangered Species Act." *Id*. at 14. Several conservation groups – siding with the FWS – sought to intervene. Unlike *Conservation Law Foundation*, the First Circuit commented that there was no inadequacy of representation of the conservation groups' point of view, since the FWS "made the choice to designate the species as endangered, and the result is what the intervenors wanted." *Id.* at 18. The First Circuit distinguished *Conservation Law Foundation* because it involved intervenors who had direct private interests which the government "could have no interest in protecting." *Id.* at 20. In essence, the FWS and the would-be intervenors shared the same goal: to declare the Atlantic Salmon an endangered species. The First Circuit stated:

> This case presents a recurring situation: a group with recognized interests wishes to intervene and defend an action of the government which the government is itself defending. . . . Generally, our decisions have proceeded on the assumption, subject to evidence to the contrary, that the government will adequately defend its actions, at least where its interests appear to be aligned with those of the proposed intervenor.

*Id*. at 19. The First Circuit noted that the FWS did not make the decision "under litigation compulsion to reach that result, but rather of [its] own accord." *Id*. at 21.

---

[5] Although the district court did not allow the groups to intervene, the court did grant them "*amicus*-plus" status. *Id.*

### 1. Interest in litigation and practical impediment to ability to protect that interest

Because there is no dispute that the Intervenors' motion to intervene is timely, the first issue is whether the intervenors have "an interest in the property or transaction that forms the basis of the ongoing suit" and whether "the disposition of the action threatens to create a practical impediment to [their] ability to protect[] [their] interest." *Kellogg*, 440 F.3d at 544-545. To find an interest in the litigation, "the intervenor's claims must bear a *sufficiently close relationship* to the dispute between the original litigants and [] the interest must be direct, not contingent." *Conservation Law Found.*, 966 F.2d at 42 (emphasis added) (citation and internal quotation marks omitted).

The Intervenors argue that their livelihoods and recreational interests are at stake – that is, DIFW could be forced to alter trapping practices if injunctive or declaratory relief issues in API's favor. The strongest authority for the Intervenors' position is *Conservation Law Foundation*.[6] Like the fishermen in *Conservation Law Foundation*, the trappers here "are the real targets of the suit and are the subjects of the regulatory plan" and their "economic interests will be substantially affected." *Conservation Law Found.*, 966 F.2d at 43. The relationship between the Intervenors' claims and the dispute between API and DIFW is sufficiently close to conclude that the Intervenors have "an interest relating to the property or transaction that forms the basis of the ongoing suit" and "the disposition of the action threatens to create a practical impediment to [their] ability to protect[] [their] interest." *Kellogg*, 440 F.3d at 544-545.

### 2. Adequate representation by existing parties

---

[6] Unlike *Conservation Law Foundation*, there is no consent decree at this point in the litigation. However, it is not unforeseeable that API and DIFW would seek to resolve this matter through a consent decree similar to the one between those plaintiffs and the Department of Commerce.

To succeed on this element, "[a]n intervenor need only show that representation may be inadequate, not that it is inadequate." *Conservation Law Found.*, 966 F.2d at 44. The court must make this inquiry "in context of the facts of the specific case." *Maine*, 262 F.3d at 14. The essential question is whether the goals of the DIFW differ from the goals of the Intervenors. They may. As in *Conservation Law Foundation*, the Intervenors' standpoint is much narrower than DIFW. While the DIFW might take into account the Intervenors' economic and recreational interests, it must also weigh countervailing factors, such as the more broadly viewed public interest. *See Conservation Law Found.*, 966 F.2d at 44-45 ("[A] governmental entity charged by law with representing the public interest of its citizens might shirk its duty were it to advance the narrower interest of a private entity"). Here, in contrast to *Maine*, there are private interests at stake, which the Intervenors stand to lose if API prevails in its action. The Court concludes that DIFW may not be able to adequately represent the Intervenors' interests in this litigation, interests relating to the property or transaction that forms the basis of the ongoing suit.

### 3. Impact on other Parties

Finally, the Court must consider the "potential adverse impact" to other parties to the litigation. *See United States v. Massachusetts*, Civ. No. 85-0632-MA, 1986 U.S. Dist. LEXIS 26224, at *27 (D. Mass. Apr. 28, 1986). Here, the two parties are API and DIFW; API alone has objected. The potential impact on API is that it will have to contend with parties who are likely to be more adversarial than DIFW and who may cause more of a fuss.[7] But, the intervention of adversarial public interest groups in a law suit of this ilk is a predictable and inevitable part of

---

[7] *The Humane Society of the United States v. Merriam*, Civ. No. 06-2922 (PJS/RLE), 2007 U.S. Dist. LEXIS 7581 (D. Minn. Feb. 1, 2007) is a recent example. After some of the same organizations involved here were allowed to intervene in a similar law suit, the intervenors objected to the dismissal of the action when the plaintiffs and the state defendants arrived at a joint stipulation and order of dismissal. The Court concluded that the intervenors could block a dismissal under Rule 41(a)(1), but not under Rule 41(a)(2).

the process.[8]  Further, the participation of all parties, including the Intervenors, will be subject to rules of civil procedure and ultimately to the oversight of the Court.

API also argues that intervention would cause undue delay, because the parties "are very close to a final agreement on a factual stipulation that would make discovery unnecessary." *Pl.'s Opp'n* at 4.  API, therefore, asks the Court to limit the Intervenors' participation to the remedy issues in which "its 'particular issues' are at stake." *Id*.

This proposal strikes the Court as untenable.  To intervene, a court must conclude, as the Court has, that the potential intervenors have an interest in the subject of the litigation, that there is a practical impediment to the ability to protect that interest, and that the current parties do not fully represent that interest.  The Intervenors' interest in the proceeding is not limited to the remedy only; it extends to whether there should be any change in the first place.  In the Court's view, the Intervenors should be allowed to participate in the process that leads to that result.

### B.     Permissive Intervention

Even if intervention of right were not available to the Intervenors, the Court would grant their motion under Rule 24(b), which allows for intervention "when an applicant's claim or defense and the main action have a question of law or fact in common." Fed. R. Civ. P. 24(b). "The fact that the applicants may be helpful in fully developing the case is a reasonable consideration in deciding on permissive intervention."  *Daggett v. Comm'n on Governmental Ethics & Election Practices*, 172 F.3d 104, 113 (1st Cir. 1999).

---

[8] The parties to this law suit, including some of the organizational Intervenors, have been involved in other similar law suits in which they spar over each other's rights to intervention.  *See Nat'l Audubon Soc'y v. Davis*, 307 F.3d 835 (9th Cir. 2002); *Doe v. Glickman*, 256 F.3d 371 (5th Cir. 2001);  *Fallini v. Hodel*, 963 F.2d 275 (9th Cir. 1992); *Animal Prot. Inst. v. Comm'r of the Minnesota Dep't of Natural Res.*, Civ. No. 06-3776 (D. Minn. Dec. 22, 2006); *The Humane Soc'y of the United States v. Merriam*, Civ. No. 06-2922 (PJS/RLE), 2007 U.S. Dist. LEXIS 7581 (D. Minn. Feb. 1, 2007).

Here, the circumstances would justify permissive intervention. First, their claim – an entitlement to trapping – is directly related to the main action because its resolution could affect trapping. Next, there is nothing to suggest that adding the Intervenors as a party would cause any undue delay or prejudice to the existing parties. Rather, the participation of the Intervenors may well prove helpful by providing the Court with disparate views of the issue. Therefore, permissive intervention would be entirely appropriate under the circumstances.

## III.   CONCLUSION

The Court concludes that the Intervenors have timely moved to intervene, that they have interests relating to the property or transaction that forms the basis of the ongoing suit, that the disposition of the action threatens to create a practical impediment to their ability to protect their interests, and that no existing party adequately represents their interests. The Court GRANTS the Intervenors' Motion to Intervene (Docket # 15).

SO ORDERED.

/s/ John A. Woodcock, Jr.
JOHN A. WOODCOCK, JR.
UNITED STATES DISTRICT JUDGE

Dated this 23rd day of February, 2007